UNITED STATES DISTRICT COURT
WESTERN DISTRICT: STATE OF NEW YORK

RONALD BRINK,

                    Plaintiff,

vs.

CITY OF ROCHESTER,
ROCHESTER POLICE DEPARTMENT,
STEPHEN BOILY,
ALEXANDER LOMBARD,
LA'RON SINGLETARY,
JOHN DOES 1-10, and
EAST/ALEXANDER HOLDINGS, LLC,

                    Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF ADDITIONAL FACTS**

Docket No:
20-CV-7049-EAW-MJP

Plaintiff RONALD BRINK ("Plaintiff"), by and through the undersigned counsel, hereby responds as follows to the Statement of Material Facts submitted by Counsel for Defendants herein.

## GENERAL OBJECTIONS

Plaintiff objects generally to the Statement of Material Facts by the Defendant herein. Federal Rule of Civil Procedure Rule 56 requires a short and concise statement of "the material facts as to which the moving party contends there is **no genuine issue** to be tried." Virtually every paragraph contains statements of which there are genuine disputes as to the facts stated therein. Additionally, the Paragraphs contain legal conclusions, opinions of the parties, and misstatements of fact.

**Paragraph 1:**       Plaintiff admits this paragraph with the exception that the Plaintiff went to Murphy's Law with "Alex Routh". Plaintiff went to Murphy's Law with Chris Louth. (Ex. K pg. 40).

**Paragraph 2:**       Plaintiff denies this paragraph. Plaintiff and his brother were not "engaged in a fight inside of the bar". Plaintiff's brother, Joseph Brink, was assaulted by a man named Hector Bettancourt, who punched Joseph Brink. Plaintiff thereafter defended his brother. (Ex. B pg. 9) (Ex. R ¶ 5).

**Paragraph 3:**       Plaintiff denies this paragraph. After the parties were separated, Plaintiff, his sister, his brother, and his friend exited the bar and were immediately attacked by Mr. Betancourt as well as several of his friends. (Ex. K pg. 38-39), (Ex. R ¶ 6-7).

**Paragraph 4:**       Plaintiff denies this paragraph. Defendant Boily testified that he addressed the crowd to stop fighting at the beginning of the encounter. (Exhibit L, pg. 105).

**Paragraph 5:**       Plaintiff denies this Paragraph, and Objects to it as a characterization of Defendant Boily's thoughts.

**Paragraph 6:**       Plaintiff denies this paragraph. Defendant Boily did not display his baton. (Ex L pg. 85). Plaintiff was swept off of his feet, and struck his head on the ground as a result of the baton strike from Defendant Boily; (Ex. B pg. 6) (Ex. K, pg. 41-42), (Affidavit of Alexis Brink, ¶ 9).

**Paragraph 7:**       Plaintiff admits this paragraph.

**Paragraph 8:**       Plaintiff admits this paragraph.

**Paragraph 9**:          Plaintiff admits this paragraph.

**Paragraph 10**:          Plaintiff denies this paragraph.  Plaintiff exhibited significant signs of a traumatic head injury, including difficulty walking, dizziness, head pain, and loss of consciousness.  Additionally, while being transported by Officer Lombard, he repeatedly requested medical attention from Officer Lombard.  Furthermore, he complained on several occasions about pain in his head (Ex. O, pg. 50-52), (Ex. G, 1:26:43 - "I've gotta go to the hospital", 1:26:48 - "I've got problems", 1:27:00 -"I need help, bro", 1:27:42-"My head, it hurts" 1:28:50- "Can you help me?").  Plaintiff also did attempt to answer pedigree questions regarding his name and his date of birth.  (Exhibit G – 1:29:23 – 1:30:00)   Furthermore, Officer Lombard testified that he closed the door to his cruiser not to await further instructions, but because, "[h]e wasn't speaking.  Didn't seem to want to speak with me anymore.  And there's paperwork to do to get him processed."  (Ex. O pg. 52).

**Paragraph 11**:          Plaintiff denies this paragraph.  There is no admissible evidence to support that conclusion.  Additionally, Plaintiff objects as this is presented as a conclusion by the 2 unidentified officers.

**Paragraph 12**:          Plaintiff denies this paragraph.  Defendant Lombard did not assist in laying the Plaintiff on the ground.  This was performed by the Rochester Fire Department. (Ex. I, 1:39:00-1:40:04).

**Paragraph 13**:          Plaintiff denies this paragraph.  Officer Lombard called EMS at 1:34 a.m.  (Ex. Q, pg. 1) (Ex. I, 1:34:00).

**Paragraph 14**:          Plaintiff admits this paragraph.

Plaintiff Submits the Following Additional Facts herein which create a genuine issue of fact precluding summary judgment.

1.      Plaintiff testified as follows at his 50-h hearing:

- That he was involved in an altercation and was slammed to the floor by a Police Officer, with his head hitting the curb; (Ex. B pg. 6).

- That he described the incident that his little brother was attacked; (Ex. B pg. 8).

- That evening, he had drank approximately 2-3 beers; (Ex. B pg. 8).

- That his brother, while talking with a female, was approached by another male, who thereafter punched his brother; (Ex. B pg.9).

- After they were directed outside by staff at Murphy's law, Mr. Brink was confronted by another individual. The two "squared up" but never exchanged blows; (Ex. B pg. 10).

- After he saw his brother being gang assaulted, he went to help out his brother; (Ex. B pg. 11-12).

- He was then separated from the individuals by a police officer; (Ex. B pg. 12).

- He was then struck in the back of the leg, falling to the ground and losing consciousness as a result of striking his head on the ground; (Ex. B. Pg. 13-14).

- After regaining consciousness, he was walked to a police cruiser by two police officers: (Ex. B. Pg. 16-17).

- As he was being escorted, he had difficulty walking and asked for medical assistance; (Ex. B. Pg. 17).

- He thereafter lost consciousness in the police cruiser and woke up 2 days later: (Ex. B. Pg. 18).

- Before being struck by Sgt. Boily, he did not hit his head at any time; (Ex. B. Pg. 19).

2.      That Plaintiff testified as follows at his Deposition:

- The individual that he "squared up" with (as seen in the television footage) is an individual named Kenny Burgio.  He testified that he and Mr. Burgio did not actually hit each other during that encounter; (Ex. K pg. 26).;

- His brother, Joseph Brink, was struck inside of Murphy's Law by an individual named Hector Betancourt, because his brother was talking to Hector's girlfriend; (Ex. K pg.  32).

- That he again does not remember being hit by anyone in the bar; (Ex. K pg. 35).

- After that, the parties were split up; (Ex. K pg.  38-39).

- He was at the bar with his sister, Alexis Brink, Joseph Brink, and Alexis's boyfriend, Chris Louth; (Ex. K pg. 40).

- After being hit by Sgt. Boily with the baton, he hit his head on the ground; (Ex. K pg.  41-42).

3.      Sergeant Boily testified:

- On the night of November 1, 2019, Boily was assigned as the supervising sergeant for the bar detail shift, which ran from 11:00 p.m. to 3:00 a.m. (Ex. L pg. 24–25).

- He was supervising four officers that night;  (Ex. L pg. 28).

- He did not have a body camera, because officers in the administrative unit were not issued them; (Ex. L pg. 59–61).

- Boily admitted that he gave no warning before striking Brink with his baton (Ex. L pg. 81).

- He did not attempt lower levels of force such as hands-on control before using the baton (Ex. L pg. 108).

- He struck Brink from a position behind or slightly offset behind him, targeting Brink's right hamstring; (Ex. L pg. 82–83).

- He described the technique as a two-handed "forward spin" baton strike, similar to a baseball-style swing (Ex. L pg. 83–84).

- Boily testified that Brink appeared intoxicated, describing him as slurring his speech, unsteady on his feet, and unable to walk without assistance (Ex. L pg. 91).

- He admitted that these same symptoms could also indicate a head injury (Ex. L pg. 91–93).

- Boily did not personally check on Brink again after moving him near the building and leaving him in Lombard's care (Ex. L pg. 95–96).

- EMS was not called until after Brink lost consciousness, rather than immediately after the baton strike (Ex. L pg. 93–95).

- He could not recall whether he personally informed EMS that force had been used against Brink (Ex. L pg. 96).

- He did list Brink's sister as a witness (Ex. L pg. 87–88, 96, 109).

- He excluded Brink's sister because he considered her "not impartial", even though he acknowledged there is no policy requiring a witness to be impartial before being documented (Ex. L pg. 109–110).

- He did not document his conversation with Ms. Brink because "at that point it was not germane to the incident outside the bar, so I did not". (Ex. L pg. 97).

- Boily completed his Subject Resistance Report (SRR) four days later, on November 5, 2019. (Ex. L pg. 52–53). (A true and correct copy of the Subject Resistance Report provided by Defendants in discovery is attached hereto as Exhibit M).

- His SRR stated that Brink "fell to the ground," whereas his testimony also indicated Brink fell to the ground, a discrepancy he downplayed by saying there was "no real difference" (Ex. L pg. 108).

- He did not document medical information he had learned from Brink's sister; (Ex. L pg. 97–99).

- He had been a defendant in four civil lawsuits, two of which alleged excessive force in addition to the Brink case (Ex. L pg. 124).

- When asked about a federal class action involving Robert Odom, in which he was named as a defendant, Boily denied any knowledge of either the case or the individual (Ex. L pg. 124).

- Although Rochester Police Department General Order 335 commands officers to immediately arrange medical treatment when a subject is injured, complains of injury, or has been subjected to force, Sergeant Boily flatly dismissed this mandate in his deposition, brushing it aside with the claim that "you have to base it on the situation and the safety of those involved"(Ex. L pg. 43-44);

4.    Alexander Lombard testified as follows:

- He agreed that the arrestees should be evaluated for medical treatment following the use of force and testified as follows. (Ex. O pg. 21).

    Q.    Is that an important rule?

    A.    Yes.

    Q.    Okay. Why?

    A.    To prevent people from being injured further, I guess.

    Q.    Okay. What else?

    A.    The person that may have -- that may be injured could seek care or we can seek care for them.

    Q.    What else?

    A.    To ensure their safety.

    Q.    Would it be wrong to not follow this rule?

    A.    I believe it would be considered wrong to not follow it.

    (Ex. O pg. 22-23).

- He was retrained after this incident for not photographing Mr. Brink, after being directed by Captain Lucyshyn, and in violation of Section of the Use of Force Policy;

- Upon arriving at the scene of Murphy's law the night of the assault, he was directed by Lieutenant Bello to grab someone on the sidewalk and put him in the patrol car. (Ex. O pg. 42-43).

- Upon first seeing Mr. Brink, he "appeared to be intoxicated." (Ex. O pg. 45).

- Mr. Brink told him he had to go to the hospital. (Ex. O pg. 48).

- After being shown the BWC video, Officer Lombard testified that he heard Mr. Brink say the following:

    "I need to go to the hospital."      (Ex. O pg. 50)

    "Can you help me?"      (Ex. O pg. 51)

    "Help me please"      (Ex. O pg. 52)

- He denied hearing Mr. Brink saying, "My head. My Head. It hurts." (Ex. O pg. 50).

- He said to Plaintiff "The longer you take to give me answers, the longer we're going to be sitting."  When asked why he said that, he stated, "He wasn't speaking.  Didn't seem to want to speak with me anymore.  And there's paperwork to do to get him processed."  (Ex. O pg. 52).

- When Mr. Brink was asking for medical attention, Office Lombard stated that he did not summon help, because he assumed he was intoxicated.  (Ex. O pg. 52).

- When he finally summoned help, Mr. Brink was administered Narcan. (Ex. O pg. 55).

- He eventually spoke with Sgt. Boily, who never told him that he used force. (Ex. O pg. 60).

- Even though Mr. Brink had his eyes closed, Officer Lombard believed Mr. Brink was still conscious and refusing to talk to him. (Ex. O pg. 65).

5.    Captain Bello testified as follows:

- That there is a written procedure that requires officers to perform an immediate medical evaluation of a person after use of force has been used; (Ex. P pg. 85-86).

- He acknowledged that was an important procedure, because "Because if somebody needs medical treatment, we need to get them that medical treatment"; (Ex. P pg. 86).

- He expected other officers to follow that rule; (Ex. P pg. 86).

- That he directed Sgt. Boily to call for an ambulance, or ensure that an ambulance was called; (Ex. P pg. 92-93).

- He does not know if the call for an ambulance went out; (Ex. P pg. 93).

- That with regard to the ambulance, "I gave a directive and expect people to follow directives when I give them." This included Sgt. Boily (Ex. P pg. 93).;

- He also testified:

> Q. Okay. And if he fails to follow, why was it important at that point for him to call the ambulance at that point?
>
> A. It would have been important because he had used force against somebody, which included a baton strike, and so as lieutenant on scene, I determined that that would be a medical evaluation.
>
> Q. And if he failed to do so, how would you characterize that behavior?
>
> A. Well, if I direct somebody to do something, they don't do it, then that would be -- obviously be issues.
>
> Q. Okay, when you say that would obviously be issues, what do you mean?
>
> A. Well, I mean, if you refuse to follow a direct order, there would be some insubordination against them.
>
> (Ex. P pg. 94).

- He reviewed the "Job Card" or "CAD Sheet" (a 911 dispatch record that logs the details of an incident, including the type of call, times,

units assigned, officer actions, and dispatcher notes), and that the call went out for an ambulance at 1:34 a.m.[1]

- At 1:25, there was no active fighting, and Captain Bello directed officers to put people in police cruisers; (Ex. P pg. 106).

- At 1:26, Captain Bello put a call out that the responding officers can slow down, because the situation was under control; (Ex. P pg. 72-73).

- That by 1:26:06 Sgt. Boily had not yet advised Captain Bello of his use of force; (Ex. P pg. 106).

- That at 1:26:02, Captain Bello directed Officer Lombard to put the Plaintiff in a police cruiser; (Ex. P pg. 107-08).

- That at 1:28:33-1:28:40, Sgt. Boily notified Captain Bello of the use of force which included a baton strike; (Ex. P pg. 110).

- He acknowledged that he said to Sgt. Boily, "even if you hit him with a baton, let's get him an ambulance" (Ex. P pg. 111-12).

- He also acknowledged that Sgt. Boily shrugged; (Ex. P pg. 112).

- He acknowledged that he did not hear anyone, including Sgt. Boily, calling for an ambulance; (Ex. P pg. 114).

- That he walked over to Mr. Brink after he became unconscious; (Ex. P pg. 115).

- That his first impression after Mr. Brink became unconscious was that he was drunk, not because of anything Mr. Brink was doing, but "we're in the bar district, there's a fight, his appearance, everything to go along with it…. Everybody involved appeared intoxicated to me. Not necessarily him specifically, it just appeared as a group of intoxicated people had gotten into a bar fight." (Ex. P pg. 122-23).

- He acknowledged that upon walking up to an unconscious Plaintiff, he stated that "he's drunk". (Ex. P pg. 130).

- He acknowledged that head injury can cause slurred speech and unconsciousness; (Ex. P pg. 132-33).

---

[1] This was when Officer Lombard made the call as demonstrated on his body worn camera.

6.     That Alexis Brink Stated:

- She was with her brothers Ronald Brink and Joseph Brink the evening of the assault; (Ex. R. ¶ 2).

- That during the evening, she did not see her brother Ronald drink to excess or use any drugs; (Ex. R. ¶ 4).

- That she witnessed her brother Joseph Brink being sucker-punched by an individual named Hector Betancourt inside of Murphy's Law; (Ex. R. ¶ 5).

- Ronald grabbed Mr. Betancourt to get him off of Joseph; (Ex. R. ¶ 5).

- At no time was Ronald punched in the head, nor did he strike his head inside of the bar; (Ex. R. ¶ 5).

- They were asked to leave the bar by security, which they did; (Ex. R. ¶ 6).

- That upon leaving the bar, Ronald was approached by Kenny Burgio, and both adopted boxing stances, but neither of them actually threw any punches; (Ex. R. ¶ 7).

- Ronald then, upon seeing his brother being gang assaulted, attempted to break them up; (Ex. R. ¶ 8).

- Sgt. Boily then came upon Ronald, walked him to the other side of the door, and struck him with a baton.  This caused Ronald to be swept off of his feet, striking his head on the ground; (Ex. R. ¶ 9).

- Ronald did not go to his knees from the baton strike; (Ex. R. ¶ 9).

- She did not tell Sgt. Boily that Ronald had been punched in the head, and did not tell him that he was drinking a lot or smoking marijuana; (Ex. R. ¶ 11).

- That Sgt. Boily did not call for medical treatment for Ronald during any time that she was near him; (Ex. R. ¶ 12).

7.     Plaintiff did not physically fight with Kenny Burgio, the individual who he adopted a "boxing stance" with; (Ex. K, pg. 26).

8.      Sgt. Boily stated in his Subject Resistance Report, "RO then used his issued expandable baton to deliver one strike to S's right rear thigh. That caused S to fall to the ground." (Ex. M, pg. 1).

9.      That the dispatch entries were contained in a sheet called a "Job Card" or "CAD Sheet".

10.     There exists "CAD Sheet" (Computer Aided Dispatch Printout), referred to Captain Bello as a "Job Card", (Ex. P pg. 55), which contains entries from the 911 Dispatchers relating to calls made over the air.  (Ex. P., pg. 60).

11.     Captain Bello's number on the job card is 401A (Ex. P pg. 65).

12.     The Job Card has the following entries:

> 1:26 - CARS CAN SLOW IT DOWN (By Captain Bello – Log number 410A) (Ex. Q).
>
> 1:34 – Ambulance is Called (Ex. Q) (Ex. P pg. 97).

13.     Rochester Police Department General Order 335 contains the following provisions in pertinent part:

> I. DEFINITIONS
>
> A. Appropriate Force - The reasonable force, based upon the totality of the circumstances known by the member, to affect an arrest, overcome resistance, control an individual or situation, defend self or others, or to prevent a subjects escape.  (Ex. N, pg. 1)
>
> II. POLICY
>
> A. Members may use only that level of physical force necessary in the performance of their duties within the limits established by Article 35 of the New York State Penal Law, and consistent with the training and policies of the Rochester Police Department. The appropriateness of force used is dependent on the totality of the

circumstances at the moment the force is used. The use of deadly physical force will be governed by GO 340. (Ex. N pg. 1)

III. PROCEDURES

A. Any member using force pursuant to their duties, or any off duty member using force regardless of whether or not it is pursuant to their duty as a police officer will:

> 1. Immediately notify their immediate supervisor of the incident.
>
> 2. After force is used, immediately evaluate the need for medical attention or treatment for that person upon whom the techniques were used and arrange for such treatment when:
>
> > a) That subject has a visible injury requiring medical attention, including injuries prior to the use of force;
> >
> > b) Subject complains of injury or requests for medical attention;
> >
> > c) OC, PLS or the Taser was used.
>
> (Ex. N pg. 3).
>
> 7. Attempt to locate and identify any witnesses and depose their observations. Original Depositions will be attached to the criminal package and copies attached to the SRR. If there is no criminal package, the original depositions will be attached to the SRR.
>
> (Ex. N pg. 5).

14.    Captain Bello's interaction with Sgt. Boily relating to Mr. Brink's medical care is contained at timestamp 1:28:28 until approximately 1:29:15. During that time, Sgt. Boily references the use of the baton.  He is instructed by Captain Bello, "if you hit him

with a baton, let's get him an ambulance." Sgt. Boily's reaction is captured at 1:29:09, when St. Boily shrugs: (Ex. J).



01066_GB1950
2019/11/01 01:29:09

15. By 1:29:55, Mr. Brink clearly loses consciousness. Officer Lombard, after Mr. Brink stops responding, states "the longer you take to answer me, the longer we are going to be here." (1:30:08). Officer Lombard then closes the door at 1:30:15. (Ex. G).

16. Officer Lombard does not approach Mr. Brink for two more minutes. It is not until 1:33:40 that Officer Lombard asks if EMS is responding, to which the dispatcher replies, "negative". (Ex. I).

17. Officer Lombard and the other officers were largely dismissive of Mr. Brink, mostly laughing at him. Captain Bello arrived at 1:37:23, stating, "What's wrong with him? Oh, he's drunk." (Ex. I).

DATED:       September 23, 2025

Respectfully submitted,

O'BRIEN & FORD, P.C.
By:     Christopher M. Pannozzo, Esq.
Attorney(s) for Plaintiff
RONALD BRINK
4549 Main Street, Suite 201
Buffalo, New York 14226
(716) 222-2222
cpannozzo@obrienandford.com